UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Cathy A. Lathrop,

    Plaintiff,

v.

Jo Anne B. Barnhart,
Commissioner of Social Security,

    Defendant.

Civil No. 06-1668 (DSD/JJG)

**REPORT
AND
RECOMMENDATION**

---

The above matter came before this Court on Plaintiff Cathy A. Lathrop's ("Lathrop") motion for summary judgment (Doc. No. 7) and on Defendant Commissioner of Social Security's ("Commissioner") cross-motion for summary judgment (Doc. No. 12). The motions are referred to this Court for a report and recommendation in accordance with 28 U.S.C. § 636 and D. Minn. LR 72.1.

**I.    BACKGROUND**

Lathrop is 49 years old. (AR 63).[1] She has been diagnosed with fibromyalgia, chronic fatigue syndrome, depression, and post traumatic stress disorder. (AR 310, 392, 397). She alleges that she became unable to work due to these conditions as of June 8, 2003. (AR 63). Lathrop had been employed at Ramsey County Workforce Solutions as a youth employment guidance counselor. (AR 152). Lathrop has a college degree in history and sociology and has taken master's level courses. (AR 152).

Lathrop states that her fibromyalgia causes her constant significant pain all over her body and sleeplessness most nights. (AR 82, 413). She states that she has difficulty focusing and that her memory

---

[1]The Court cites to the administrative record in this matter as "AR __".

has suffered. (AR 82). She states that all her activities have been negatively affected by the fibromyalgia pain and other symptoms and that she has difficulty keeping up with the day-to-day activities of life such as paying bills, conversing, and cleaning. (AR 82). Lathrop has good days and bad days. (AR 413). On her good days, she is able to walk her dog, do some housework, and talk to her friends. (AR 411). On her bad days, she cannot do those things, and instead may just brush her teeth and lie back down. (AR 423). Her symptoms vary with the weather, the season, and the temperature. (AR 424). Lathrop stated that she has one to four bad days per week. (AR 424). She stated that she has three good days per week, three weeks per month. (AR 413).

Lathrop treated with various medical providers in an attempt to manage her medical conditions. (AR 77-78, 154-399). Drs. Caccamo and Radovsky, two of Lathrop's family practice doctors, completed residual functional capacity questionnaires, as did her psychologist, Louise Quinn. (AR 310-315, 392-396, 397-399). On May 3, 2004, Dr. Caccamo stated that Lathrop's diagnoses were fibromyalgia and depression, with a "poor" prognosis. (AR 310). He indicated that her pain was "moderately severe, all the time," and that it was severe enough to "frequently" interfere with her attention and concentration. (AR 312). In response to the question, "To what degree can your patient tolerate work stress," Dr. Caccamo responded, "I don't know." (AR 312). He stated that Lathrop would have good days and bad days, but was "uncertain" regarding the amount of time Lathrop would likely miss work as a result of her impairments. (AR 315). In response to the question, "Identify the clinical findings, laboratory and test results which show your patient's medical impairments," Dr. Caccamo stated, "None." (AR 310).

In September 2005, Dr. Radovsky stated that Lathrop suffered from fibromyalgia and chronic fatigue. (AR 392). Like Dr. Caccamo, she indicated that Lathrop's pain was severe enough to "frequently" interfere with attention and concentration. (AR 394). In response to a question regarding ability to tolerate work stress, Dr. Radovsky indicated, "Capable of low stress job," explaining, "Physical symptoms exacerbate emotional Dx. In past has held high stress jobs - but cannot work with deadlines right now." (AR 394). In response to the question, "As a result of your patient's impairments, estimate your patient's functional limitations if your patient were placed in a competitive work situation," Dr. Radovsky stated, "Unable to function in workplace right now." (AR 394). She stated that Lathrop would have good days and bad days, and estimated that Lathrop would miss work more than four times per month due to her impairments. (AR 396).

Also in September 2005, psychologist Louise Quinn stated that Lathrop would have difficulty relating to others due to depression and PTSD and that her concentration and short term memory were impaired. (AR 397). With regard to Lathrop's "reliability," Quinn indicated that Lathrop's ability was "poor/none" "due to medical issues." (AR 398). Quinn explained, "Due to the client[']s MH symptoms, as well as the unpredictable nature of her physical symptoms, client would likely not be able to relate personally and socially in a <u>predictable</u> manner." (AR 398) (emphasis in original). Quinn estimated that Lathrop would miss work more than three times per month as a result of her impairments. (AR 399).

Following several leaves of absence from her job, Dr. Caccamo recommended in January 2004 that Lathrop take an indefinite leave of absence from that job due to her fibromyalgia symptoms. (AR 240).

3

Lathrop applied for disability insurance benefits under the Social Security Act on September 11, 2003, alleging that she became disabled as of June 8, 2003. (AR 63-65). Her application was denied on November 4, 2003. (AR 25-27). She filed a Request for Reconsideration on November 17, 2003, which was denied on December 26, 2003. (AR 40-42). She then requested a hearing before an Administrative Law Judge, which occurred on August 30, 2005. (AR 43, 404).

On December 3, 2005, the Administrative Law Judge ("ALJ") issued his Decision denying Lathrop disability insurance benefits. (AR 14-22). The ALJ concluded that Lathrop suffered from the severe impairments of fibromyalgia, chronic fatigue syndrome, depression, and anxiety. (AR 16). He also concluded that she was unable to perform her previous job as a social worker. (AR 21). Based on his residual functional capacity determination and the testimony of a vocational expert, the ALJ determined that Lathrop could perform other work in the national economy and, therefore, denied her application for benefits. (AR 22). The ALJ relied solely on the opinion of a non-testifying, non-examining medical expert to formulate the restrictions and limitations contained in his residual functional capacity determination. (AR 20).

On April 6, 2006 the Appeals Council denied Lathrop's request for review of the ALJ's Decision. (AR 6). Lathrop then filed the instant action.

**II.   ANALYSIS**

At issue in this matter is Lathrop's ability to function in the workplace. It is undisputed that she suffers several severe impairments. The question at issue is how those impairments affect her ability to work.

Lathrop argues that the ALJ erred in three ways, all relating to his residual functional capacity ("RFC") determination. First, she contends that the ALJ failed to properly weigh the medical evidence by relying solely on a non-treating, non-examining medical expert and by discounting the opinions of her treating medical providers. Second, she argues that the ALJ's hypothetical to the testifying vocational expert was improper and that the ALJ, therefore, had insufficient evidence upon which to make his conclusion regarding her ability to do other work. Third, she contends that the ALJ erred in assessing her credibility.

### A. Standard of Review

This Court must determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the ALJ's conclusion. *Id.* The Court must consider evidence that supports, as well as detracts from, the Commissioner's decision. *Id.* "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." *Id.*

It is well-settled in the Eighth Circuit that once a claimant shows that she is unable to perform past work, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Id.*

### B. Weighing of Residual Functional Capacity Medical Evidence

The Court first considers Lathrop's contention that the ALJ improperly weighed the medical evidence in his residual functional capacity ("RFC") analysis.

5

*1.     Reliance on Non-Treating, Non-Examining Medical Expert*

The ALJ discounted the opinions of Lathrop's treating medical providers, relying instead on the opinion of a medical examiner, Dr. Gannon, who testified at the benefits hearing. Dr. Gannon never examined or treated Lathrop. Rather, he based his opinion regarding Lathrop's RFC on a paper review of her medical records.

A non-treating, non-examining physician's assessment alone does not constitute "substantial evidence" supporting an RFC determination. In *Nevland,* 204 F.3d at 857, the court explained:

> The ALJ relied on the opinions of non-treating, non-examining physicians who reviewed the reports of the treating physicians to form an opinion of Nevland's RFC. In our opinion, this does not satisfy the ALJ's duty to fully and fairly develop the record. The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole.

(citing *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999)). The court emphasized that the RFC determination is a "medical question" requiring "medical evidence," and concluded that the opinions of non-treating, non-examining doctors did not constitute such "medical evidence." *Id. See also Bowman v. Barnhart*, 310 F.3d 1080, 1085 (8th Cir. 2002) (same); *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (holding that assessments of non-treating physicians "alone cannot be considered substantial evidence [supporting RFC determination] in the face of the conflicting assessment of a treating physician") (citation omitted); *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) (reversing and remanding denial of benefits to claimant with fibromyalgia where ALJ improperly relied on non-treating physicians' opinions).

Here, the ALJ expressly and solely relied on the testifying medical expert, Dr. Gannon, to formulate Lathrop's RFC. The ALJ's decision states that it "adopts the restrictions and limitations cited by the medical expert present at the hearing." (AR 20). Because the *Nevland* line of cases is clear that a non-

6

treating, non-examining physician's opinion regarding RFC does not constitute substantial evidence, the ALJ erred. *Nevland*, 204 F.3d at 857.[2]

In this case, the ALJ's improper reliance on the non-treating, non-examining medical expert's opinion is compounded by additional problems. Dr. Gannon is a general surgeon who performed cardiac and thoracic surgeries. (AR 428). Although he testified that he treated patients with pain, he acknowledged that he was not a primary treating source for people with fibromyalgia. (AR 429). Thus, not only did Dr. Gannon never treat or examine Lathrop, his opinion regarding her ability to work given her fibromyalgia and other impairments was outside his area of expertise. As Dr. Gannon, himself, admitted, he is a heart surgeon, not a doctor who treats patients with impairments such as Lathrop's. Therefore, even if the ALJ's heavy reliance on Dr. Gannon's testimony somehow passed muster under *Nevland*, it would remain unjustified due to Dr. Gannon's lack of relevant expertise. *See Singh*, 222 F.3d at 452 ("The Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").[3]

Equally troubling is the incomplete record of the benefits hearing, which does not reflect whether Dr. Gannon even factored Lathrop's fibromyalgia into his RFC recommendations. Dr. Gannon did not

---

[2]The ALJ stated that he "accommodated" a portion of the opinion of Lathrop's treating psychologist, Louise Quinn, (AR 19), but made clear that his RFC determination was based on "the restrictions and limitations cited by the medical expert present at the hearing." (AR 20).

[3]The ALJ overstated Dr. Gannon's expertise in treating patients with fibromyalgia, stating, "[H]e has treated patients with significant pain, including those with fibromyalgia pain, for decades." (AR 21). Dr. Gannon testified that he treated patients with pain, including "fibrous" pain, but admitted that he is not a primary treating source for patients with fibromyalgia. (AR 429).

include fibromyalgia as one of Lathrop's impairments when he testified at he benefits hearing. (AR 425).

When Lathrop's lawyer questioned him regarding this, he stated:

> A.  It really wasn't missed. It was encountered frequently through the exhibit. However, I don't identify any listing in the social security regulations that clearly fits the impairment of fibromyalgia.
> Q:  Okay. So you're not saying that she doesn't have it. You just didn't see that it was a listed impairment and therefore didn't mention it?
> A.  Why I didn't list it as [a]n impairment is because in going over the listings from beginning to end, I failed to find any listing that equals or meets the particular description.
> Q:  Okay. Did you take fibromyalgia into account when you outlined her functional impairments, then took the overall description of her ability to do things?
>
> [no answer transcribed]
>
> Q:  Okay. Dr. Gannon, I note in looking at your vitae that you [sic] background is as a general surgeon, right?

(AR 428). Thus, on the record before us, the Court cannot even conclude that the non-treating, non-examining medical expert, whose surgical speciality is outside the medical area at issue, factored one of Lathrop's primary diagnoses into his RFC recommendations. The ALJ, himself, recognized that this rendered Dr. Gannon's testimony "problematic" and "unconventional," but improperly relied on it anyway. (AR 20). Under these circumstances, a reasonable mind could not conclude that substantial evidence supported the ALJ's RFC determination.

### 2. *Discounting of Treating Medical Providers' Opinions*

In relying solely on Dr. Gannon, Lathrop argues that the ALJ improperly discounted the opinions of her treating medical providers. "A treating physician's opinion is generally entitled to substantial weight, although it is not conclusive and must be supported by medically acceptable evidence." *Kelley*, 133 F.3d at 589. Lathrop contends that the ALJ gave insufficient weight to the opinions of Drs. Radovsky and

Caccamo, and her psychologist, Louise Quinn.

The Court does not find substantial evidence in the record for the ALJ's discounting of Dr. Radovsky's opinion. Lathrop relies on a September 2005 "Fibromyalgia Residual Functional Capacity Questionnaire" completed by Dr. Radovsky, a family practice doctor who had been treating her every one to two months for approximately one year. (AR 392-396). Her diagnoses of Lathrop were fibromyalgia and chronic fatigue. (AR 392). She indicated that Lathrop's pain was severe enough to "frequently" interfere with attention and concentration. (AR 394). In response to a question regarding ability to tolerate work stress, Dr. Radovsky indicated, "Capable of low stress job," explaining, "Physical symptoms exacerbate emotional Dx. In past has held high stress jobs - but cannot work with deadlines right now." *Id.* However, Dr. Radovsky went on to conclude, "Unable to function in workplace right now," in response to the question, "As a result of your patient's impairments, estimate your patient's functional limitations if your patient were placed in a competitive work situation." *Id.* She also estimated that Lathrop would miss work more than four times per month due to her impairments. (AR 396).

The ALJ gave Dr. Radovsky's opinion "little weight" because he found it "somewhat confusing." (AR 19). He stated that his confusion stemmed from the following passage in her report:

> 16. As a result of your patient's impairments, estimate your patient's functional limitations if your patient were placed in a competitive work situation:
>
> Unable to function in the workplace right now.
>
> a. How many city blocks can your patient walk without rest or severe pain?
>
> Bad days-None, moderate-6, good-20.

(AR 394).

9

Because the portion of Dr. Radovsky's opinion regarding Lathrop's ability to walk city blocks was written on the right hand side of the page near the margin, the ALJ apparently concluded that it referred to Lathrop's ability to function in the workplace, not her ability to walk. As the ALJ stated, "[S]he [Dr. Radovsky] says that the claimant has no bad days, six moderate days and 20 good days over a period of time, but would likely miss work more than four times per month due to bad days." (AR 19-20). The Court does not find substantial evidence in the record to support the ALJ's reading of Dr. Radovsky's report. The report clearly states that Lathrop is "unable to function in the workplace right now" and that she would have frequent absences from work. The portion of her opinion stating "bad days - none, moderate - 6, and good -20" plainly addresses the number of city blocks Lathrop can walk without rest or severe pain, not her ability to function in the workplace. (AR 394). The ALJ's confusion is, therefore, unsupported by substantial evidence in the record.

The ALJ also discounted Dr. Radovsky's opinion because Dr. Radovsky stated that Lathrop should "sometimes" elevate her legs while sitting. (AR 20). The ALJ found this conclusion to be unsupported by the record. Even assuming this to be the case, this minor portion of Dr. Radovsky's opinion was not a sufficient basis for the ALJ to completely reject it, especially where it is otherwise fully consistent with the record as a whole.

Lathrop also argues that the ALJ improperly rejected the opinion of Louise Quinn, her psychologist, and Dr. Caccamo, one of her treating physicians. The ALJ rejected the portion of Quinn's opinion addressing Lathrop's reliability, stating that it was based on her assessment of Lathrop's physical symptoms, a subject outside her area of expertise as a psychologist. (AR 19). The ALJ rejected Dr. Caccamo's opinions because he found them inconsistent, vague, and generally not useful. (AR 20). While

the Court finds the ALJ's discounting of these doctors' opinions somewhat questionable, it cannot conclude that his decision was unsupported by substantial evidence. *See Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001) (holding that so long as more than a scintilla of evidence supports the ALJ's decision, that decision shall be affirmed, even though substantial evidence may support a contrary outcome).

In sum, the Court finds that the ALJ's decision to give "little weight" to Dr. Radovsky's opinion is not supported by substantial evidence in the record and, therefore, was erroneous. The Court finds that the ALJ's decision with respect to the opinions of Dr. Caccamo and Louise Quinn is supported by substantial evidence in the record.[4]

### C.     Vocational Expert's Hypothetical

After formulating Lathrop's RFC, the ALJ determined that she could no longer perform her past work as a social services worker. (AR 21). He then proceeded to the step 5 of the Social Security disability evaluation process, which required him to determine whether Lathrop could perform any other type of work given her RFC. At this stage "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland*, 204 F.3d at 857. The ALJ relied on a vocational expert's testimony in determining whether Lathrop could perform other work. (AR 22).

---

[4]Lathrop also relies on the March 23, 2004 Minnesota Department of Economic Security Rehabilitation Services Assessment for Services Report in which a rehabilitation counselor indicated that Lathrop experiences "significant episodic functioning which substantially limits ability to work consistently." (AR 150.) Although the ALJ does not specifically address this report, his lack of reference to it does not mean that he did not consider it. *Black v. Apfel,* 143 F.3d 383, 386 (1998).

Lathrop contends that the vocational expert's conclusion that she could perform other types of work was erroneous because it was based on improper medical evidence. The Court agrees. Because the ALJ improperly relied on Dr. Gannon's opinion in formulating Lathrop's RFC, the vocational expert's conclusion based on that RFC opinion was necessarily erroneous as well. The Court notes that Dr. Radovsky's opinion regarding Lathrop's reliability was not included in the hypothetical posed to the vocational expert. The Commissioner cannot meet its step 5 burden of showing that Lathrop can perform other types of work based on inadequate medical testimony. *Singh*, 222 F.3d at 453 (citing *Pratt v. Sullivan*, 956 F.2d 830, 836 (8th Cir. 1992)); *Nevland*, 204 F.3d at 858 (citing *Jenkins*, 196 F.3d at 925).

### D.     Lathrop's Credibility

Given this Court's rejection of the medical basis for the ALJ's RFC determination and the consequently faulty hypothetical upon which the step 5 evaluation was based, the Court need not reach Lathrop's argument that the ALJ erred in his assessment of her credibility. *See Dornack v. Apfel*, 49 F. Supp.2d 1129, 1143 (D. Minn. 1999) (holding that it was unnecessary to reach further issues raised by claimant where threshold issue necessitated remand).

### E.     Remand Is Appropriate

On the inadequately developed record before the Court, the Court cannot conclude that the evidence "overwhelmingly supports" an immediate finding of disability. *See Buckner v. Apfel*, 213 F.3d 1006, 1010-11 (8th Cir. 2000). The Court, therefore, recommends that this matter be remanded to the

Commissioner for further proceedings in accordance with this Report and Recommendation. The Court recommends that the ALJ consider proper medical evidence in formulating Lathrop's RFC, including the opinion of Dr. Radovsky. The Court also recommends that the hypothetical posed to the vocational expert at step 5 be based on appropriate medical evidence as discussed above.

### III.  CONCLUSION

Substantial evidence does not support the Commissioner's decision regarding Lathrop's RFC and her ability to perform other jobs in the national economy. The Commissioner erroneously relied on the opinion of a non-treating, non-examining medical expert, improperly discounting the RFC recommendations of Lathrop's treating medical provider. The vocational expert's conclusion that Lathrop could perform other work in the national economy was predicated on the improper medical testimony and was, therefore, also erroneous. The Court, therefore, recommends remand to the Commissioner for further proceedings in accordance with this Report and Recommendation.

### IV.  RECOMMENDATION

Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

A.  The Plaintiff's Motion for Summary Judgment (Doc. No. 7) be DENIED.

B.  The Defendant's Motion for Summary Judgment (Doc. No. 12) be DENIED.

C.  The matter be REMANDED to the Commissioner for further proceedings consistent with this Report and Recommendation.

D.      Judgment be entered in accordance with the holding in *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Dated this 18th day of July, 2007.

>                             s/Jeanne J. Graham
>
>                             _____
>                             JEANNE J. GRAHAM
>                             United States Magistrate Judge

**NOTICE**

Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by August 6, 2007. A party may respond to the objections within ten days after service. Any objections or responses filed under this rule shall not exceed 3,500 words. The District Court shall make a de novo determination of those portions to which objection is made. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the United States Court of Appeals for the Eighth Circuit.